**Exhibit 2**

**IN THE MATTER OF THE ARBITRATION BETWEEN:**

------------------------------------------------------X

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, ON BEHALF OF ITSELF AND EACH OF THE RELATED INSURERS THAT PROVIDED COVERAGE TO RESPONDENT,**

                               **Claimants,**

     **-and-**

**GAINEY CORPORATION,**

                             **Respondent.**

------------------------------------------------------X

## DEMAND FOR ARBITRATION

**TO:**   Gainey Corporation
      6000 Clay Avenue SW
      Grand Rapids, MI 49548-5785
      Attn:  Mr. Harvey Gainey
             President

Claimants are National Union Fire Insurance Company of Pittsburgh, Pa., on behalf of itself and each of the related insurers that provided coverage to the Respondent pursuant to the Agreements (as defined below) (collectively, the "Claimants"). Claimants assert their claim for security (the "Security") owed and any other amounts due or that may become due pursuant to the Payment Agreement for Insurance Risk Management Services, between the Claimants and Gainey Corporation, the related schedules and any amendments thereto (collectively, the "Agreement") annexed hereto as Exhibit A. Requests for a letter of credit have been made in the amount of $8,325,000, and no letter of credit has been provided. The Agreement provides for arbitration of this dispute and Claimants hereby demand arbitration thereunder.

S:\MLevitt\CASES\Gainey Corporation\demand fr...

NU 2001

## RELIEF CLAIMED AND NATURE OF DISPUTE

Claimants seek an award requiring the delivery of Security under the Agreement, for any other amounts due or that may become due, for all legal fees and costs, and such further relief as is appropriate.

## DEMAND FOR ARBITRATOR

Claimants hereby demand that Respondent appoint an arbitrator within thirty (30) days of receipt of this Demand for Arbitration and notify Claimants in writing at the address stated below of such appointment.

## HEARING LOCALE

Claimants request that the arbitration hearing be held in New York, New York.

### CPLR Section 7503(c)

Please take notice that Claimant invokes Section 7503(c) of the Civil Practice Law and Rules of New York ("Section 7503") for the sole purpose of notifying Respondent that unless Respondent applies to stay the arbitration within twenty (20) days after such service of this Demand for Arbitration, Respondent shall thereafter be precluded from objecting that a valid agreement to arbitrate was not made. In all other respects, Claimants affirmatively assert that the United States Arbitration Act, Title 9 of the United States Code, shall apply herein.

Dated: New York, New York
March 8, 2007

Michelle A. Levitt, Esq.
70 Pine Street, 28th Floor
New York, New York 10270
Telephone: (212) 770-7075

S:\MLevitt\CASES\Gainey Corporation\demand for arbitration 1-

ATTORNEY FOR CLAIMANTS

NU 2002

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the 01 day of June, 2006

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company

And *You*, our Client

*GAINEY CORPORATION*
*6000 CLAY AVE SW*
*GRAND RAPIDS  MI  49548-5785*

In consultation with *Your* representative

*HNI TRUCK GROUP*
*1621 COLONIAL PARKWAY*
*INVERNESS IL  60067*

NU 2003

# PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | |
| Table of Contents | 1 |
| Who Has Agreed To This Agreement? | 2 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your Payment Obligation*? | 3 |
| When Must *You* Pay *Your Payment Obligation*? | 4 |
| What Is the Payment Plan? | 4 |
| What Is the Billing Method? | 4 |
| What About Collateral? | 5 |
| What Is Default? | 6 |
| What May We Do In Case Of Default? | 7 |
| How Will Disagreements Be Resolved? | 7 |
| To Whom Must *You* and We Give Notices? | 8 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 9 |
| Are *You* Authorized to Make This Agreement? | 9 |
| Signatures | 9 |
| Schedule of Policies and Payments | 10 |
| | Appended |

NU 2004

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:

- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the Insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

We have agreed to the following:

- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

*You* have agreed to the following:

- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1.  "ALAE" means Allocated Loss Adjustment Expense as defined in the *Policies*.
2.  "Deductible Loss Reimbursements" means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.
3.  "Loss" or "Losses" means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.
4.  "Policy" or "Policies" means:

    - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
    - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.

5.  "Retained Amount" or "Retention" means one of the following:

    - Self-Insured Retention: the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
    - Deductible: the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
    - Loss Limit: the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

Edition 12/98 A

NU 2005

# PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6.  "**Schedule**" means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7.  "**You**" or "**Your**" means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8.  "**Your Payment Obligation**" means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    •  the premiums and premium surcharges,

    •  *Deductible Loss Reimbursements*,

    •  any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,

    •  any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

    **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us. *You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement. A **Credit Fee** may be charged for any unsecured credit extended to *You*. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

Edition 12/98 A

NU 2006

# PAYMENT AGREEMENT

## Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

## Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

# WHAT IS THE BILLING METHOD?

**Deposit and Installments:** *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the Direct Billing Method or the Automatic Withdrawal Method, or a combination of both. *Your* choice is shown in the *Schedule*.

## Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your* Retention and *Your* share of ALAE covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

## Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your* Retention and *Your* share of ALAE covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*. *You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your* Retention and *Your* share of ALAE during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

NU 2007

# PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral Is Required

You must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *You*, *Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

Edition 12/98 A

NU 2008

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to *Your* primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request. If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement,
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

# WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

   - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

   - *Your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this agreement. However, *Your* concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

# WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

Edition 12/98 A

NU 2009

# PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. You authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and
- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your* Payment Obligation.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

Edition 12/98 A

NU 2010

# PAYMENT AGREEMENT

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof. *You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

*Expenses of Arbitration:* You and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *You* at *Your* address in the *Schedule*. You must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

You hereby represent and warrant that *Your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *Your* behalf has full right and authority to execute and deliver this agreement and to bind *You* jointly and severally.

Edition 12/98 A

00 00/0000 007/02 945/0154

NU 2011

# PAYMENT AGREEMENT

## SIGNATURES

TO SIGNIFY AGREEMENT, You and we have caused this Agreement to be executed by the duly authorized representatives of each.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**
On behalf of itself and its affiliates first listed above:

In New York, New York,
This 10 day of May, 2006
Signed by _____
Typed Name Scott. R. Westburg
Title Authorized Representative

For **You**, our Client

**Client's Name**

In _____, ____,
This 11 day of June, 2006
Signed by _____
Typed Name DAVID CARTER
Title V P

NU 2012

## ADDENDUM to the PAYMENT AGREEMENT

## LOSS DEVELOPMENT FACTORS

This Addendum changes the Payment Agreement. Please read it carefully.

This Addendum is effective 06/01/2006, and
forms a part of the Payment Agreement effective 1 June 2006 between

You, **GAINEY CORPORATION**, and

Us, National Union Fire Insurance Company of Pittsburgh, Pa. and all its affiliates.

Loss Development Factors (LDF's) are multipliers that we use to help us estimate the final amount of *Your Payments Obligation* because of the final amounts of *loss* and *ALAE* arising out of accidents, occurrences, or offenses covered by the Insurance to which the Payment Agreement applies.
To estimate such final amounts of *loss* and *ALAE*, we will:

1.  determine as of a specific valuation date and separately by kind of insurance the total amount of such *loss* and *ALAE* that we will have paid and reserved for future payment on specific claims under the *Policies*; and

2.  multiply such total amount of *loss* and *ALAE* by the LDF shown in the Grid below next to that valuation date under that kind of insurance.
If the valuation date falls between two dates in the Grid, we will determine the applicable LDF by linear interpolation.

We may apply a different table of LDF's that will enable us more accurately to estimate such final amount of *loss* and *ALAE*, if during the term of the policies,

1.  a change occurs in the hazards insured against because of *your* acquisition or disposition of a subsidiary, division or operation with assets at least equal to 20% of *your* assets on the effective date hereof, or

2.  we change the organization that provides claims service under the *policies*, or

3.  we change *your retention* under any of the *policies*, or

4.  any other change occurs which is likely to render the LDF's shown in the Grid ineffective in estimating with reasonable accuracy the final amount of *loss* and *ALAE* that we will pay because of accidents, occurrences, or offenses covered by the *Policies*.

### GRID of Loss Development Factors

| Valuation Date | Kind of Insurance | | | |
|---|---|---|---|---|
| | Workers Comp LDF's | General Liability LDF's | Auto Liability LDF's | _____ LDF's |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Authorized Signature for you, and Date          Authorized Signature for us, and Date

Edition 1/00

NU 2013

**2006 Addendum**

**to**

# PAYMENT AGREEMENT

By and between us

National Union Fire Insurance Company of Pittsburgh, Pa.
On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Vermont
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
Granite State Insurance Company
Landmark Insurance Company
New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

**GAINEY CORPORATION**
**6000 CLAY AVE SW**
**GRAND RAPIDS  MI  49548-5785**

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the **1** day of **June, 2006**

1. The section entitled WHO HAS AGREED TO THIS AGREEMENT?, is deleted and replaced with the following: This Agreement is between:

   · *You*, the organization(s) named as "our Client" in the *Schedule*, and
   · *us*, the insurers set forth above as "Company", "we", "us" and "our" in this Addendum.

2. The section entitled WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation, is deleted and replaced with the following:

   "**Your Payment Obligation**" means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   · the premiums and premium surcharges, taxes and assessments,
   · *Deductible Loss Reimbursements*,
   · any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
   · any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

NU 2014

- costs and expenses incurred by any third party administrator.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles:** If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies*. Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule*.

3. The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

We will contract with a Third Party Administrator (TPA) that *you* select for the adjustment of *your* claims under the *Policies* provided that we consent to *your* selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to *you* upon *your* request. Any TPA *you* select must meet all of our licensing requirements. *You* will be responsible for any costs associated with any change from one TPA to another TPA that we or *you* make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on *your* behalf shall be considered part of *Your Payment Obligation*, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4. The section entitled: **WHEN MUST YOU PAY YOUR PAYMENT OBLIGATION?** is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the invoice, Notice or Bill date or *Your* evidenced receipt date of the invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5. The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

Collateral Exchange:

At our sole discretion we may approve *Your* substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve *your* substitution or exchange of collateral if *you* are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6. The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRATION PROCEDURES - How Arbitrators Must Be Chosen**, is deleted and replaced with the following:

How arbitrators must be chosen: You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

7. The section entitled: **ARE YOU AUTHORIZED TO MAKE THIS AGREEMENT?** is amended to include the following:

NU 2015

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *Us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without your agreement on all of them. For that reason, you should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**
On behalf of itself and its affiliates first listed above:

In New York, New York,
This *10* day of *July* 2006,
Signed by _____
Typed Name Scott R. Westburg
Title Authorized Representative

**For You, our Client**

**GAINEY CORPORATION**

In _____, ____,
This *29* day of *June*_____, *2006*
Signed by _____
Typed Name *DAVID CARTER*
Title _____*VP*_____

2006 Addendum to P...

NU 2016

# LARGE RISK RATING PLAN ENDORSEMENT

## PLAN TYPE SHORT TERM

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" needs to be completed only when this endorsement is issued subsequent to the preparation of the policy.)

This Endorsement, effective 12:01 AM **06/01/2006** forms a part of Policy Number **WC 1166852**
Issued to **GAINEY CORPORATION**
By **The Insurance Company of the State of Pennsylvania.**

## PART I. GENERAL TERMS and CONDITIONS

This endorsement determines the *Final Premium* for the insurance provided during the Rating Period by this policy, any other policy described in this endorsement in Section 1 of PART II, and the renewals and replacements of each (the "policies"). The Rating Period begins and ends at 12:01 AM on the respective dates shown in Section 1 of PART II. If the Plan Type of this endorsement states Construction Project, this endorsement applies only to, and for the duration of, the construction project described in Section 1 of PART II.

The rates and the basis types described in PART II will remain fixed for the duration of the Rating Period, except (if applicable) Section 7 "Claims Service Charges on Fee Basis", Section 8 "Taxes, Assessments and Surcharges", and any applicable items set forth in Section 11 "Exceptions". These exceptions will be subject to change at each anniversary of the beginning of the Rating Period.

## Section 1. Premium Calculation

The *Final Premium* for the policies will be the sum of the total *Subject Premium* and the total *Non-Subject Premium*. The way that the total *Subject Premium* will be determined is described below and is shown in Section 9, Item A of PART II. The way that the total *Non-Subject Premium* will be determined is described below and is shown in Section 9, Item B of PART II.

A. **Total Subject Premium**: The total *Subject Premium* for the policies will be determined separately by state and kind of insurance. For each state and kind of insurance, the *Subject Premium* shall be the sum of *Subject Losses* and the Charges for the Insurance Charge, Expenses and Profit divided by the Tax/Assessment Divisor as determined below.

　1. <u>Subject Losses</u>: The first part of the *Subject Premium* will be the sum of all *Subject Losses* under any applicable terms of the policies described in Section 1 of PART II and as identified in Section 5, Item A of PART II.

　2. <u>Charges for Insurance Charge, Expenses and Profit</u>: The second part of the *Subject Premium* will be the component parts of the *Subject Premium* other than *Subject Losses* that are identified as line items in Section 9, Item A of PART II.

　　The entire estimated amount of each such charge can be found in Section 9, Item A of PART II subject to any applicable Minimum Premium shown for it.

　　We will apportion the entire amount of each such charge to each kind of insurance and state covered under the policies in proportion to the respective *Standard Premium* of each, except that:

　　a. Charges for claims service expenses will be allocated in proportion to respective *Subject Losses*, and

　　b. Charges for administrative expenses and profit for the kinds of insurance in the states described in Section 2 of PART II will be the difference between:

　　　i. the *Final Premium* for such kinds of insurance and states determined as provided for in the policy other than by this Endorsement, and

　　　ii. the sum of *Subject Losses*, all other charges for the Insurance Charge, Expenses and Profit included in this item 2, taxes and assessments determined through the application of the Tax/Assessment Divisor, and *Non-Subject Premiums* for such states.

　3. <u>Tax/Assessment Divisor</u>: One (1.000) less the Tax/Assessment Rate as shown in Section 9 Item A of PART II. The rate is calculated as indicated in Section 8 of PART II.

B. **Total Non-Subject Premium**: The part of the *Final Premium* for the kinds or layers of insurance described in Section 9, Item B of PART II will be calculated as shown therein. If no *Basis* of premium determination for *Premium* is shown in Section 9, Item B of PART II, the *Non-Subject Premium* will be calculated as shown in the policy under which such insurance is provided.

NU 2017

# LARGE RISK RATING PLAN ENDORSEMENT

## Section 2. Schedule of Premium Adjustments

A. The estimated *Final Premium* is shown in Section 9, Item C of PART II. We will recalculate the estimated *Final Premium* as soon as practicable after the First Valuation Date shown in Section 5 of PART II. We will recalculate the estimated *Final Premium* annually thereafter until you and we agree in writing that no more recalculations will be done.

B. Additional premium due us, or return premium due you, resulting from the calculation or recalculation of the *Final Premium*, will be payable in its entirety promptly unless otherwise specified in a premium finance agreement between you and us.

## Section 3. Expected Total Cost

In addition to *Final Premium*, you may be liable under the terms of the policies for reimbursements of certain losses and *Allocated Loss Adjustment Expenses* we pay, subject to any *Minimum Cost* and *Maximum Cost* as described below, and surcharges. Our estimated amounts for such additional costs, if any, are shown in Section 9, Item C of PART II.

A. **Minimum Cost**: If a *Minimum Cost* is applicable, that amount is the minimum you must pay for the *Subject Premium* and, if applicable, *Non-Subject Premium, Reimbursable Losses, Deductible Losses, Self-Insured Losses and ALAE* itemized in Section 6 Item A. c. of PART II. Component items not itemized in Section 6, Item A. c. of PART II are not included in the *Minimum Cost*. If an Adjustment Rate and a *Basis* of Adjustment are shown in Section 6, Item A. a. of PART II, the *Minimum Cost* will be determined by multiplying the Adjustment Rate by the actual *Basis* of Adjustment as determined by our final audit of your books and records.

B. **Maximum Cost**: If a *Maximum Cost* is applicable, that amount is the maximum you must pay for *Subject Premium* and, if applicable, *Non-Subject Premium, Reimbursable Losses, Deductible Losses, Self-Insured Losses and ALAE* itemized in Section 6 Item B. c. of PART II. Component items not itemized in Section 6, Item B. c. of Part II are not included in the *Maximum Cost*. If an Adjustment Rate and a *Basis* of Adjustment are shown in Section 6, Item B. a. of PART II, the *Maximum Cost* will be determined by multiplying the Adjustment Rate by the actual *Basis* of Adjustment as determined by our final audit of your books and records.

## Section 4. Definitions

A. *"Aggregate Stop Amount"* means the maximum amount of benefits, damages and *ALAE* payable by you for losses under the policies described in Section I of PART II, subject to any *Aggregate Stop Limit*.

B. *"Aggregate Stop Limit"* means the maximum amount of benefits, damages and *ALAE* above the *Aggregate Stop Amount* that we will not require you to reimburse us for under any Loss Reimbursement or Deductible terms of the policies described in Section I of PART II.

C. *"Allocated Loss Adjustment Expenses"* or *"ALAE"* will include all fees for service of process and court costs and court expenses; pre- and post-judgement interest; attorneys' fees; cost of undercover operative and detective services; costs of employing experts; costs for legal transcripts, copies of any public records, and costs of depositions and court-reported or recorded statements; costs and expenses of subrogation; and any similar fee, cost or expense reasonably chargeable to the investigation, negotiation, settlement or defense of a loss or a claim or suit against you, or to the protection and perfection of your or our subrogation rights.

*ALAE* will not include loss adjustment expenses explicitly included in the premium calculation formula of Section 1, Paragraph A, Item 2 of this PART I or otherwise explicitly included in the rating values shown in PART II; nor the salary, employee benefits, or overhead of any of our employees, nor the fees of any attorney who is our employee or under our permanent retainer; nor the fees of any attorney we retain to provide counsel to us about our obligations, if any, under any policy issued by us or our affiliated companies, with respect to a claim or suit against you.

*ALAE* Option selected and shown in Section 3 of PART II is described below.

a. <u>Option A</u>: *Subject Loss* includes all or a part of all *ALAE* such that the *Subject Loss* will not exceed the applicable *Retained Amount*.

b. <u>Option B</u>: *Subject Loss* includes 100% of all *ALAE*.

c. <u>Option C</u>: *Subject Loss* includes all or a part of *ALAE* calculated according to the following formula:

   i. if we incur NO obligation under the policies to pay damages, benefits or indemnity resulting from a claim, *Subject Loss* under that claim will include all *ALAE* up to the applicable *Retained Amount*. That of all *ALAE* in excess thereof.

# LARGE RISK RATING PLAN ENDORSEMENT

ii.   if we DO incur an obligation to pay damages, benefits or indemnity under the policies because of a claim, *Subject Loss* under that claim will include all *ALAE* incurred under that claim, multiplied by the amount of our obligation to pay damages or benefits up to the applicable *Retained Amount*, divided by the total amount of our obligation to pay damages or benefits.

    d.   <u>Option D</u>: *Subject Loss* includes none of the *ALAE*.

D.   *"Basis"* will have the meaning(s) shown in Section 10 of PART II.

E.   *"Deductible Loss"* means any amount that you must reimburse us under a Deductible Endorsement of the policies described in Section I of PART II.

F.   *"Final Premium"* means the premium for the insurance afforded under the policies described in Section 1 of PART II and others as may be added by endorsement thereto, upon its final recalculation according to the terms of the policies and this endorsement. Prior to such final recalculation, the premium for such insurance is only the estimated premium.

G.   *"Incurred Loss"* means the total amount we have paid and have reserved for payment as damages or benefits because of an occurrence, accident, claim or suit, and all the *Allocated Loss Adjustment Expenses* we incur in connection therewith under a policy described in PART II, including reserves for occurrences, accidents, claims or suits that have happened but have not been reported to us and for statistically expected loss development on claims that have been reported to us.

H.   *"Minimum Cost"* means the minimum amount payable by you for the Schedule of *Subject Premium* and *Reimbursable Losses* and *Deductible Losses* and *Self-Insured Losses* and *ALAE*, if applicable, described in Section 6 of PART II.

I.   *"Maximum Cost"* means the maximum amount payable by you for the Schedule of *Subject Premium* and *Reimbursable Losses* and *Deductible Losses* and *Self-Insured Losses* and *ALAE*, if applicable, described in Section 6 of PART II.

J.   *"Non-Subject Premium"* means the premium not subject to the premium calculation of this endorsement.

K.   *"Reimbursable Loss"* means any amount that you must reimburse us under a Loss Reimbursement Endorsement of the policies described in Section I of Part II.

L.   *"Retained Amount"* means:

    1.   the amount that is specified as your Self-Insured Retention or as the Loss Reimbursement amount or Deductible amount applicable to an *Incurred Loss* in the applicable policy; or

    2.   if the foregoing does not apply, the largest part of any damages or benefits paid or payable under a policy because of any single accident, occurrence, claim or suit, that we will include in the computation of the *Subject Premium*.

Such amount is shown in Section 4 of PART II for each type of insurance afforded under the policies described in Section 1 of PART II.

M.   *"Self-Insured Loss"* or *"SIR"* means any loss you incur under a Self-Insured Retention of the policies described in Section I of PART II.

N.   *"Standard Premium"* means the premium as calculated according to the terms of each applicable policy, without application of this Endorsement, subject to the following:

    1.   For Workers Compensation and Employers Liability Insurance, *Standard Premium* means the premium determined on the basis of our rates as approved by regulatory authority, the remuneration of your employees in the coverage period, your Experience Modifications and Schedule Modifications, Loss Constant, and Minimum Premiums. Determination of *Standard Premium* will exclude:

        a.   any discount that recognizes any reduction in our expense ratio based on premium size or other factors; or

        b.   any discount for a Loss Reimbursement or Deductible.

        c.   Expense Constant.

    2.   For all other insurance, *Standard Premium* is the premi...

## LARGE RISK RATING PLAN ENDORSEMENT

    a.   any discount that recognizes any reduction in our expense ratio based on premium size or other factors; or

    b.   any discount for a Loss Reimbursement or Deductible.

O.  *"Subject Loss"* means the entire *Incurred Loss* (including any reimbursable or deductible portion of it) up to the sum of:

    1.   the damages or benefits we must pay or have paid up to the *Retained Amount*, and

    2.   all or a part of the *Allocated Loss Adjustment Expenses* we incur in accordance with the *ALAE* Option shown in Section 3 of PART II and defined in Item C of this section.

P.  *"Subject Premium"* means the premium subject to retrospective adjustment on the basis described in Section 1, Paragraph A of this PART I.

### Section 5. Exceptions and Changes

All exceptions and changes, if any, to the provisions of PART I , PART II or PART III of this endorsement are set forth in Section 11 of PART II or in a written addendum hereto.

NU 2020

# LARGE RISK RATING PLAN ENDORSEMENT

## PART II. *SCHEDULE* of POLICIES and RATING VALUES

### Section 1. APPLICATION of this Endorsement

RATING PERIOD: This Endorsement applies to the period beginning **06/01/2006** and ending **01/01/2007**. The *Basis* of Premium, *Subject Losses, Self-Insured Losses, Minimum Cost, Maximum Cost,* Minimum Premiums and Estimated Premiums shown in Section 5, Section 6, Section 7 and Section 9 of this PART II are estimated amounts for:

☐ the **first year** of the Rating Period, or ☒ the **entire** Rating Period.

POLICIES:   ☒ This Endorsement applies to the policies described below, and to their replacements and renewals effective during the Rating Period, or

☐ This Endorsement applies to the policies described below, and to their replacements and renewals, and all subcontractor policies issued under a **Construction Project**. The Construction Project is described as follows:

N/A

a. Workers Compensation and Employers Liability Insurance policies:
   **WC 1166850 , WC 1166851 , WC 1166852 , WC 1167177.**

b. Commercial General Liability Insurance policies:

c. Automobile Liability Insurance policies:

d. Other Insurance policies (described):

### Section 2. Premiums for insurance on risks in states described below will be determined in accordance with the terms of the applicable policy other than this endorsement.

| Kinds of Insurance | | States |
|---|---|---|
| WC | FL(Florida WC) | |

### Section 3. *Allocated Loss Adjustment Expenses* Options

| ALAE Option (enter ALAE Option A, B, C or D as applicable) | If ALAE Option C, enter Excess % | Applies to |
|---|---|---|
| B | 0% | WC 1166850 , WC 1167177 , WC 1166852 , WC 1166851 |

# LARGE RISK RATING PLAN ENDORSEMENT

**Section 4.** *Retained Amounts:* ☒ applicable to all insureds; or ☐ refer to Extension Schedule

| Kind of Insurance | Retained Amount | Applicable to | Limitations or Descriptions |
|---|---|---|---|
| **Workers Compensation** | | | |
| Workers Compensation and Employers Liability under State Law - **Insured States** | See Schedule | Each Accident or each Person for Disease | |
| Workers Compensation and Employers Liability under Federal Law - **Insured States** | See Schedule | Each Accident or each Person for Disease | |
| Workers Compensation and Employers Liability - **Self-Insured States** | See Schedule | Each Accident or each Person for Disease | |
| Employers Liability - Monopolistic States | | Each Accident or each Person for Disease | |
| | | Each Accident or each Person for Disease | |
| **Commercial General Liability** | | | |
| Premises, Operations, Personal and Advertising Injury, Medical Payments, or Damage to Property Liability | $0 | Each Occurrence | |
| Products or Completed Operations Liability | $0 | Each Occurrence | |
| [Other] | | Each Occurrence | |
| **Commercial Automobile Liability, including UM/UIM and PIP/No Fault,** *if any* | | | |
| Automobile Liability | $0 | Each Accident | |
| Garage Liability | $0 | Each Accident | |
| [Other] | | Each Accident | |
| Combined Kinds Retention | | Each Occurrence | |

## Section 5. Forecast of *Subject Losses*

We have shown our forecast of your *Subject Losses* below.

a. Reimbursable and deductible portion of covered *Incurred Losses* (except amounts insured under "Deductible Liability Protection" policies, if any, subject to this Endorsement)        $3,900,000

b. All other covered *Subject Losses* (including amounts insured under "Deductible Liability Protection" policies, if any, subject to this Endorsement)        $1,000,000

**First Loss Valuation Date:** 06/30/2007 and annually thereafter until all claims are closed or mutually agreed upon as to value.

## Section 6. *Minimum Cost* and *Maximum Cost*

The *Minimum Cost* and *Maximum Cost*, if any, will be applied as explained below.

**Item A. *Minimum Cost:*** ☐ applicable, or ☒ not applicable

Line of Insurance:        None

a. *Minimum Cost*, adjustable on the *Basis* and rate shown below:        $0

Basis of Adjustment:        None

NU 2022

## LARGE RISK RATING PLAN ENDORSEMENT

b.   *Self-Insured Losses* you incur to which no insurance under the policies described in Section 1 of this PART II applies **will** NOT be included in determining whether or when the *Minimum Cost* has been reached, except as described herein:

**Exceptions:**   N/A

Our forecast of your *Self-Insured Losses* included in paragraph a. above   **$0**

c.   The following *Minimum Cost* itemization schedule applies:

### Item B. *Maximum Cost:* ☐ applicable, or ☒ not applicable

Line of Insurance:     None

The *Maximum Cost* will not be less than the estimated amount shown below, unless otherwise set forth in Section 11 of PART Two.

a.   *Maximum Cost*, adjustable on the *Basis* and rate shown below:     **$0**

Basis of Adjustment:     **None**                         Per     0

Estimated *Basis* amount:     **$0**                                    **Adjustment Rate:**     0.0000

b.   *Self-Insured Losses* you incur to which no insurance under the policies described in Section 1 of this PART II applies **will** NOT be included in determining whether or when the *Maximum Cost* has been reached, except as described herein:

**Exceptions:**     N/A

Our forecast of your *Self-Insured Losses* included in paragraph a. above     **$0**

c.   The following *Maximum Cost* itemization schedule applies:

# LARGE RISK RATING PLAN ENDORSEMENT

## Section 7. Claims Service Charges

☐ Charge shown in Section 9, Item A *Subject Premium* of PART II, or ☐ fee schedule described below.

The Claims Service Provider is:

### FEE SCHEDULE

☐ If X'ed here, the following fee schedule applies:

Claims Services Fee Schedule - Rates per Claimant

| Type of Claim | Rate per Claimant | Estimated No. of Claimants | Estimated Fee |
|---|---|---|---|
| Workers Comp | | | |
| Medical | | | |
| Indemnity | 0.00 | 0 | |
| California | 0.00 | 0 | $0 |
| Texas | 0.00 | 0 | $0 |
| AOS | 0.00 | 0 | $0 |
| Surcharge Claims | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| General Liability | 0.00 | 0 | $0 |
| Bodily Injury | | | $0 |
| Property Damage | 0.00 | 0 | |
| Other | 0.00 | 0 | $0 |
| Product Liability | 0.00 | 0 | $0 |
| Bodily Injury | | | $0 |
| Property Damage | 0.00 | 0 | |
| Other | 0.00 | 0 | $0 |
| Automobile Liability | 0.00 | 0 | $0 |
| Bodily Injury | | | $0 |
| Property Damage | 0.00 | 0 | |
| Physical Damage | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| Incident Reports | 0.00 | 0 | $0 |
| Int. to Designated States | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| | 0.00 | 0 | $0 |
| Estimated Total Rate-per-Claimant Fee | | | $0 |

NU 2024

# LARGE RISK RATING PLAN ENDORSEMENT

☐ If X'ed here, the following fee schedule applies:

## Additional Service Fees Details

| Additional Service Fees | Item Count | Rate/Item | Estimated Fee |
|---|---|---|---|
| Quarterly Loss Report | 0 | 0.00 | |
| Subcontractor Interoffice Supervision | 0 | 0.00 | $0 |
| Magnetic Tape Fee | 0 | 0.00 | $0 |
| Subrogation | 0 | 0.00 | $0 |
| Appraisals | 0 | 0.00 | $0 |
| TPA Expenses | 0 | 0.00 | $0 |
| GAB Expenses | 0 | 0.00 | $0 |
| Cash Management Account Services | 0 | 0.00 | $0 |
| Claim File Reviews | 0 | 0.00 | $0 |
| Contingency Recovery Fees | 0 | 0.00 | $0 |
| Incoming Quality Control | 0 | 0.00 | $0 |
| Legal Cost Control | 0 | 0.00 | $0 |
| Location Visits | 0 | 0.00 | $0 |
| Semiannual Client Meetings | 0 | 0.00 | $0 |
| RMIS Reports | 0 | 0.00 | $0 |
| Customized Account Servicing | 0 | 0.00 | $0 |
| Structured Settlement Program | 0 | 0.00 | $0 |
| Reporting | 0 | 0.00 | $0 |
| Conversion | 0 | 0.00 | $0 |
| Minimum Adjusting Fee | 0 | 0.00 | $0 |
| Intellirisk Charges | 0 | 0.00 | $0 |
| Administration Fee | 0 | 0.00 | $0 |
| Estimated Additional Services Fee | | | $0 |

## Tail Fees Details

| Tail Fees | Item Count | Rate/Item | Estimated Fee |
|---|---|---|---|
| Workers Comp Med. Only | 0 | 0.00 | |
| Workers Comp. Indemnity | 0 | 0.00 | $0 |
| General Liability | 0 | 0.00 | $0 |
| Products Liability | 0 | 0.00 | $0 |
| Auto Liability | 0 | 0.00 | $0 |
| Maintenance | 0 | 0.00 | $0 |
| Estimated Tail Fee | | | $0 |

NU 2025

# LARGE RISK RATING PLAN ENDORSEMENT

☐ If X'ed here, the following fee schedules applies:

## Fee Schedule - Time and Expenses

| Type of Charge | Rate | Per | Est. Units | Estimated Fee |
|---|---|---|---|---|
| Investigating Service by Employed Staff | | | | |
| Adjuster | | Hour | | |
| General Adjuster | | Hour | | |
| Executive General Adjuster | | Hour | | |
| Heavy Equipment Appraiser | | Hour | | |
| Auto Damage Appraiser | | Hour | | |
| Property Damage Appraiser | | Hour | | |
| Supervisor | | Hour | | |
| Examiner | | Hour | | |
| Account Manager | | Hour | | |
| | | Hour | | |
| | | Hour | | |
| | | Hour | | |
| Subcontracted Investigations And Appraisals | | Hour | | |
| Clerical and Statistical Processing | | Hour | | |
| Other Expenses, including | | Hour | | |
| Telephone | | Minute | | |
| Postage & Express Mail | | Cost | | |
| Auto Mileage, Rental, Tolls, Parking | | Mile | | |
| Photocopies | | Copy | | |
| Photography | | Photo | | |
| Public Transportation | | Cost | | |
| Overhead | | Flat | | |
| Services Outside of USA | | | | |

| | |
|---|---|
| Estimated Total Time and Expense | $0 |
| Estimated Total Claims Service Expenses | $0 |

NU 2026

# LARGE RISK RATING PLAN ENDORSEMENT

## Section 8. Taxes and Assessments

The taxes and assessments determined by the method indicated by the box "X'd" below shall apply in determining the *Final Premium* earned under the policies described in Section 1 of Part II during the first annual term of this endorsement. If the Rating Period under this endorsement is longer than 1 year, we will provide you written notice of the applicable taxes and assessments for the subsequent term of the Rating Period not less than thirty (30) days prior to each anniversary of this endorsement.

### ☒ Item A. Fixed Rates

The Average Rates for taxes and assessments are shown in Item A. of Section 9 of PART II. The Average Rates will be fixed and applied without change in determining the *Final Premiums* earned under the policies described in Section I of PART II during the first annual period of this Endorsement.

### ☐ Item B. Rates to be Recalculated

The Average Rates for taxes and assessments are shown in Item A. of Section 9 of Part II. The Average Rates will be recalculated to determine the *Final Premium* under the policies described in Section I of PART II, based on the rates shown in the chart below.

NU 2027

# LARGE RISK RATING PLAN ENDORSEMENT

**Section 9. The Rating Values and Amounts** shown below apply as the *Basis* of the *Final Premium* for the policies described in Section 1 of this Part II.

If the Rating Period exceeds one year; and if the estimated *Basis* of Premium, Minimum Premiums and Estimated Premiums shown below apply only to the first year, on or about each anniversary of the beginning of the Rating Period, we will issue an extension of this Section to show the rating values and amounts for each subsequent year of the Rating Period.

## Item A. *Subject Premium*, part of *Final Premium*

| Line Items | Rates | Per | *Basis* Types | Estimated *Basis* | Minimum Premium | Estimated Premium |
|---|---|---|---|---|---|---|
| Expected Primary Losses | 0.0000 | 1 | ULTIMATE LOSSES | 0 | $0 | $1,000,000 |
| Taxes/Assessments % | 0.0000% | or | Taxes/Assessments Divisor: | 0.000000 | Subtotal | $1,000,000 |
| | | | | | | $0 |
| | | | | Estimated Total *Subject Premiums* | | $1,000,000 |

## Item B. Non-*Subject Premiums*, part of *Final Premium*

| Coverage Description | Rates | Per | *Basis* Types | Estimated *Basis* | Minimum Premium | Estimated Premium |
|---|---|---|---|---|---|---|
| Non LRRP-WCFlorida WC | 0.0000 | 1 | STANDARD PREMIUM | 0 | $0 | $204,735 |
| WC AOS | 1.6794 | 100 | WC PAYROLL | 87,400,146 | $1,467,798 | $1,467,798 |
| | | | Estimated Total Non-*Subject Premiums* | | | $1,672,533 |

## Item C. Summary of Expected Total Cost

| | | | | | | |
|---|---|---|---|---|---|---|
| Estimated *Final Premium* (Part A. plus Part B) | | | | | | $2,672,533 |
| Expected *Reimbursable Losses* and *Deductible Losses* and *Self-Insured Losses* and ALAE, if applicable | | | | | | $3,900,000 |
| Minimum Cost from Section 6. If not applicable, show $0 | | | | | | $0 |
| Maximum Cost from Section 6. If not applicable, show $0 | | | | | | $0 |
| Surcharges: | 0.0000 | 1 | STANDARD PREMIUM | 0 | $0 | $204,517 |
| | | | EXPECTED TOTAL COST | | | $6,777,050 |

NU 2028

# LARGE RISK RATING PLAN ENDORSEMENT

## Section 10. Basis of Premium:

**Payroll:** means all of the money or the substitute for money earned during the terms of the policies described in Section 1 of this PART II by you if you are the proprietor of the insured business, by all partners or joint venturers if you are a partnership or joint venture, by all members if you are a limited liability company, and by all employees including temporary employees and workers leased by you from any employee leasing organization for their services to you during the policy period, subject to limitations set forth in the New York Workers Compensation Rating Bureau's manual rules, if applicable.

**Sales:** means the gross amount of money you or others trading in your name have charged for all goods and services you or they have sold or distributed during the terms of the policies described in Section 1 of this PART II, including charges for delivery, installation, service and repair, and including taxes other than taxes which you or such others collect as a separate item and remit directly to a government division.

**Receipts:** means the gross amount of money you have charged others for work that you, your partners, your employees, your contractors and subcontractors at all levels have performed during the terms of the policies described in Section 1 of this PART II, including taxes other than taxes which you or such others collect as a separate item and remit directly to a government division.

**Cost:** means the total cost to you for all work performed for you during the terms of the policies described in Section 1 of this PART II by independent contractors and their subcontractors at all levels, including the cost of all labor, materials, equipment and supplies furnished, used or delivered for use in the execution of such work, whether furnished by the owner, by contractors, or subcontractors at any level, including but not limited to all fees, allowances, bonuses, and commissions either made, paid or due, as well as taxes other than taxes which you collect as a separate item and remit directly to a government division.

**Units:** means the number of items of the type specified in this endorsement. Units that you hold for use in your business will mean the sum of their number at the inception of the terms of the policies described in Section 1 of this PART II plus their number at their expiration or termination, times 50% of the fraction of a full year that such policies were in force. Units that you sell to others whether for your own account or the account of another means the total number of such units that you sell during the term of such policies.

**Indemnity Losses:** means the total amount we have paid and have reserved for payment as Workers Compensation benefits other than Medical benefits under a policy described in this PART II, including reserves for accidents or illness that have happened but have not been reported to us and for statistically expected loss development on claims that have been reported to us.

**Other:** (Other)

## Section 11. Exceptions

NU 2029

# LARGE RISK RATING PLAN ENDORSEMENT

## PART III. AGGREGATE STOP

The *Aggregate Stop Amount* and the *Aggregate Stop Limit*, if any, shown in the Schedule below will be applied as explained below.

## Section I. Aggregate Stop Amount

1. If an *Aggregate Stop Amount* is shown in the Schedule below, we will not include more than the *Aggregate Stop Amount* in the computation of the *Final Premium* and determination of maximum benefits, damages and "ALAE" payable or reimbursable by you under the terms of the policies described in Section I of PART II, subject to any *Aggregate Stop Limit* shown in the Schedule below.

   The maximum benefits, damages and *ALAE* to be included in the computation of the *Final Premium* will be the *Aggregate Stop Amount* shown in the Schedule below, less the following:

   a) all *Subject Losses* that you must reimburse us for under any Loss Reimbursement or Deductible terms applicable to the policy covering the *Incurred Loss*, and

   b) such amounts as described in Section III below that you have paid as *Self-Insured Losses*.

2. **Adjustment:** If an Adjustment Rate and an Adjustment *Basis* are shown in the Schedule below, the *Aggregate Stop Amount* shown in the Schedule below is only an estimate. The *Aggregate Stop Amount* will be finally determined by multiplying the Adjustment Rate by the final Adjustment *Basis* as determined by our audit of your books and records. The *Aggregate Stop Amount* will not be less than the estimated amount shown in the Schedule below, unless otherwise set forth in Section 11 of PART Two

3. The *Aggregate Stop Amount* will not be reduced on account of the cancellation of any policy to which this Endorsement applies.

## Section II. Aggregate Stop Limit

1. If an *Aggregate Stop Limit* is shown in the Schedule below, that Limit is the most *Subject Losses* above the *Aggregate Stop Amount* that will be excluded from the computation of the *Final Premium* and which you will not be required to reimburse us for under any Loss Reimbursement or Deductible terms of the policies described in Section I of PART II.

2. The *Aggregate Stop Limit* will not be reduced on account of the cancellation of any policy to which this Endorsement applies.

## Section III. Self-Insured Losses

*Self-Insured Losses:* Losses you incur to which no insurance applies under the policies described in Section I of PART II will NOT be included in determining whether or when the *Aggregate Stop Amount* or *Aggregate Stop Limit* have been reached, except as described herein:

Exceptions: None

## SCHEDULE
### Aggregate Stop Amount and Aggregate Stop Limit

Line of Insurance:      None

The *Aggregate Stop Amount* and the *Aggregate Stop Limit* apply to the ☐ first year of, or ☐ entire Rating Period.

a. *Aggregate Stop Amount*, adjustable on the *Basis* and rate shown below.

b. *Basis* of Adjustment      None      Per    0

|  |  |
|---|---|
| Estimated *Basis* Amount: | $0 |
| | $0 |
| Adjustment Rate: | 0.0000 |

c. *Aggregate Stop Limit*

Countersigned by _____      $0

NU 2030

## EXTENSION SCHEDULE of the LARGE RISK RATING PLAN ENDORSEMENT

### RETAINED AMOUNTS EXTENSION SCHEDULE

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" needs to be completed only when this endorsement is issued subsequent to the preparation of the policy.)

This Endorsement, effective 12:01 AM **06/01/2006** forms a part of Policy Number **WC 1166852**

Issued to **GAINEY CORPORATION**

By **The Insurance Company of the State of Pennsylvania.**

**The following** *Retained Amounts* **apply in addition to those shown in Part II, section 4 of the Large Risk Rating Plan Endorsement attached to the policy described above.**

| Kind of Insurance | Retained Amount | Basis of Retention | Limitations or Descriptions |
|---|---|---|---|
| **Workers Compensation** | | | |
| Workers Compensation and Employers Liability under State Law - Insured States | $500,000 | Each Accident or each Person for Disease | |
| Workers Compensation and Employers Liability under Federal Law - Insured States | $500,000 | Each Accident or each Person for Disease | |
| Workers Compensation - Self-Insured States | $0 | Each Accident or each Person for Disease | |
| Employer's Liability - Monopolistic States | $0 | Each Accident or each Person for Disease | |
| **Workers Compensation** | | | |
| Workers Compensation and Employers Liability under State Law - Insured States(Florida WC) | $500,000 | Each Accident or each Person for Disease | |
| Workers Compensation and Employers Liability under Federal Law - Insured States(Florida WC) | $500,000 | Each Accident or each Person for Disease | |
| Workers Compensation - Self-Insured States | $0 | Each Accident or each Person for Disease | |
| Employer's Liability - Monopolistic States | $0 | Each Accident or each Person for Disease | |

Countersigned by _____ Date _____

(Authorized Signature)

NU 2031